Case No. 24-40058

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

LAWRENCE DIKE,

PLAINTIFF - APPELLANT

V.

COLUMBIA HOSPITAL CORPORATION, ET. AL.,

DEFENDANTS - APPELLEES

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

BRIEF OF APPELLANT
LAWRENCE DIKE

**Adam Poncio**
**PONCIO LAW OFFICES**
**A Professional Corporation**
**5410 Fredericksburg Road #109**
**San Antonio, Texas 78229-3550**
**Telephone: (210) 212-7979**
**Facsimile: (210) 212-5880**

**ATTORNEY FOR APPELLANT**

**May 15, 2024**

i

## <u>Certificate of Interested Persons</u>

The undersigned counsel of record certifies that the following people have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.    Larence Dike, Appellant herein and Dike in the trial court, was represented by his attorney in the trial court, Charles C. Smith, State Bar No. 18550210, S.D. ID No. 4312, 615 N. Upper Broadway, Suite 1710 Corpus Christi, Texas 78401, ccsmithlaw@aol.com.

2.    Lawrence Dike is represented on appeal by Adam Poncio, State Bar No. 16109800, S.D. ID No 194847, Poncio Law Offices, P.C., San Antonio, Texas 78229, aponcio@ponciolaw.com.

3.    Appellees Columbia Hospital Corporation of Bay Area, Individually and d/b/a Corpus Christi Medical Center; Bay Area Healthcare Group, Ltd., Individually and d/b/a Corpus Christi Medical Center, Appellees herein and Defendants in the trial court and her attorneys in the trial court and on appeal

4.    Appellees are represented on appeal by Sarah B. Morton with Ford Harrison in the trial court, State Bar No. 24066151, Federal I.D. No. 966164, FORDHARRISON LLP, Houston, Texas and Kevin Little, State Bar No. 24070155, Federal ID No. 1138412.

**/s/ Adam Poncio**
**ADAM PONCIO**
**COUNSEL FOR APPELLANT**

## **Statement Regarding Oral Argument**

The Appellant believes that oral argument would permit a full discussion of the evident facts and evidence of pretext that support a factual question for the jury to decide whether or not Appellant suffered retaliation based on her complaints and opposition to discrimination and the error committed by the trial court in granting summary judgment as to the retaliation and discrimination claims involved in those errors.

## TABLE OF CONTENTS

Certificate of Interested Persons ...............................................................-ii-

Statement Regarding Oral Argument ........................................................-ii-

Table of Contents ....................................................................................-iii-

Table of Authorities ..................................................................................-v-

Statement of Jurisdiction.........................................................................-vii-

Statement of the Issues Presented for Review ..........................................-1-

1.      Could a reasonable jury find that Dike was fired because he complained about discrimination and retaliation ........................................................-1-

Statement of the Case...............................................................................-2-

A.      Procedural Background ...................................................................-2-

B.      Factual Background ........................................................................-2-

Summary of Argument ............................................................................-18-

Argument.................................................................................................-20-

A.      Standard of Review........................................................................-20-

B.      A Reasonable Jury Could Find That Appellees Fired Dike In Retaliation For His Complaints About Discrimination, And Retaliation Based on the Numerous Substantial Conflicts In Evidence, A Reasonable Jury Could Conclude That There Is Compelling Evidence Of Retaliation…………………………………………………………...……-21-

C.      Based on the "Chain of Circumstances," A Reasonable Jury Could Conclude
        that There Is Compelling Evidence Of Retaliation. .................................  -21-

D.      A Reasonable Jury Could Find All Reasons Given for Dismissing Dikle
        Were Pretextual. ........................................................................................-26-

E.      Based on the Numerous Substantial Conflicts In Testimony, A Reasonable
        Jury Could Conclude That There Is Compelling Evidence Of Retaliation
        ....................................................................................................................-28-

Conclusion and Prayer for Relief........................................................................-28-

Certificate of Service ..........................................................................................-30-

Certificate of Compliance ..................................................................................  -30-

# **Table of Authorities**

<u>CASES</u>

*Ashcroft v. Iqbal* 556 U.S. 662,677-678 (S.Ct. 2009).........................................- 22 -

*Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir.1996)..........- 23 -

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (S.Ct. 2007)........... - 22 -, - 24 -

**Benchmark Elecs., Inc. v. J.M. Huber Corp.**, 343 F.3d 719, 723-24 (5th Cir.2003) ..................................................................................................................- 11 -

**Collins v. Morgan Stanley Dean Witter**........................................................- 11 -

*Copeland v. D&J Construction, LLC,* 2016 WL 1212128, *2 (N.D. Tex, 2016) ..................................................................................................................-19 -

*Culbertson v. Lykos* 790 F.3d 608, 618 (5th Cir. 2015) .............. - 13 -, - 15 -, - 20 -

*Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir.1977) (per curiam).........- 23 -

*Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir.1998)............................................................................- 24 -

**In re Katrina Canal Breaches Litig**...............................................................- 11 -

**Jones v. Greninger**,188 F.3d 322, 324 (5th Cir.1999).....................................- 11 -

*Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir 2002)........................................- 13 -

*Knick v. Township of Scott Pennsylvania* 139 S.Ct. 2162,2166 (S.Ct.2019)...- 18 -

**Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC** 594 F.3d 383, 387 (5th Cir. 2010) ..................................................................................................- 11 -

*McDaniel v. United States*, 899 F.Supp. 305, 307 (E.D.Tex.1995) ..................- 23 -

*Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980) ...........- 23 -

*Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises* 625 S.W. 2d 295, 298 (Tex. 1981) ................................................................................- 19 -

*Ramming v. U.S.* 281 F.3d 158 (5th Cir. 2001) ...................................- 22 -, - 23 -

*Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004)....................- 12 -

*Stanton v. Sims,* 134 S.Ct. 3,4,5 (2013) ..............................................- 21 -

*Strother v. Columbia-Brazoria Independent School Distirct* 839 F.Supp. 459,461 (S.D. Tex. Galveston 1993) ................................................................- 20 -

*White v. Mississippi State Oil and Gas* 650 F.2d 540, 543 (5th Cir. 1981) ......- 20 -

*Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981)...................- 24 -

<u>STATUTES</u>

28 U.S.C. § 1331 .......................................................................................vi

28 U.S.C. §1291 ........................................................................................vi

42 U.S.C. § 1983 ......................................................................................- 2 -

*TX LOCAL GOV'T CODE § 271.15* ...............................................- 19 -

<u>RULES</u>

Fed.R.App.P. 4(a)(1)..................................................................................vi

*FRCP 12(b)(1)* ............................................................... - 2 -, - 20 -, - 22 -

*FRCP 8(a)(2)* ...........................................................................................- 20 -

## **Statement of Jurisdiction**

The district court had federal question jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal statutes, including Title VII and 42 U.S.C. section 1981.

Pursuant to 28 U.S.C. §1291, this Court has jurisdiction over this appeal from the district court's order of granting summary judgment. This order became final on January 2, 2024, when the district court entered an order granting Appellees' summary judgment motion.

Appellant timely filed her notice of appeal on November 17, 2020, within 30 days of the order granting summary judgment and entry of the final judgment. See Fed. R. App. P. 4(a)(1).

Case No. 24-40058

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT


## LAWRENCE DIKE,

## PLAINTIFF - APPELLANT

## V.

## COLUMBIA HOSPITAL CORPORATION, ET. AL.,

## DEFENDANTS - APPELLEES


## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION


## BRIEF OF APPELLANT
## LAWRENCE DIKE

_____


### Statement of the Issues Presented for Review

1.     A reasonable jury could find that Lawrence Dike was subjected to

discrimination, harassment and then retaliation because he complained about

discrimination and retaliation based on his race, color and national origin.  The

evidence is clear that the District Court disregarded the applicable summary

judgment standards and that the standards applied by the court do not consider or improperly disregard the recent opinions in *Muldrow*, *Hamilton* and *Abdallah*.

2.    This court should vacate and/or set aside the opinion of the District Court and remand to the District Court for reconsideration, including re-briefing and/or reconsideration, based on the recent this court should vacate and/or set aside the opinion of the District Court and remand to the District Court for reconsideration, including re-briefing and/or reconsideration, based on the significant impact in this case of the recent United States Supreme Court opinion in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. ---- (April 17, 2024), and/or this court's recent opinions in *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir., August 18,2023) and *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006 (5th Cir., October 13, 2023).

## Statement of the Case

### A.    Procedural Background

3.    Appellant Lawrence Dike filed his Original Complaint against Appellees Columbia Hospital Corporation of Bay Area, Individually and d/b/a Corpus Christi Medical Center; Bay Area Healthcare Group, Ltd., Individually and d/b/a Corpus Christi Medical Center on December 23, 2021. *ROA.24-40058.9-23*.[1]  Appellant asserted causes of action based on discrimination, a hostile environment and

---

[1] HCA was originally a Defendant in this case but was later nonsuited by Appellant Dike's counsel.

retaliation under Title VII and 42 U.S.C section 1981 claims based on race, color and national origin.

4.      Subsequently, Appellees filed their motions for summary judgment on August 15, 2023 (Dkt 38 with exhibits at 39, 40, 41and 42).  Appellant filed his response on August 5, 2023 (Dkt 43 and 44).  Reply briefs were filed by Appellees on September 12, 2023 (Dkt 46 and 47).

5.      The District Court issued its Memorandum Opinion and Order on January 2, 2024 (Dkt 50) and its Final Judgment on January 2, 2024 (Dkt 51)

6.      Appellant filed his Notice of Appeal on January 30, 2024 (Dkt 52).

       **B.      Factual Background**

7.      This is an appeal of a summary judgment granted in a civil action brought by Dike/Appellant Lawrence Dike against Defendants/Appellees Columbia Hospital Corporation of Bay Area, Individually and d/b/a Corpus Christi Medical Center; Bay Area Healthcare Group, Ltd., Individually and d/b/a Corpus Christi Medical Center; and HCA Healthcare, Inc.   HCA was later non-suited or dismissed as a party. Appellant Dike brought suit against Appellees for discrimination and retaliation violations based on race, color and national origin under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and discrimination and retaliation violations under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, §1981a.

8.    Appellant Lawrence Dike (hereinafter "Dike") is a Black African who was born in Nigeria, a country in West Africa. Dike's ethnicity, cultural and linguistic characteristics are of the Black African people of Nigeria. Although fluent in English, Dike speaks Igbo and speaks with a Nigerian accent.  Dike started working for Corpus Christi Medical Center on June 27, 2016. (Dike's Depo 102: 4-7, Exhibit B) after he was interviewed by Marissa Zamora, who was the manager over Three West (Dike's Depo 102:8-4, Exhibit B) he was hired for the job as a certified nurse assistant (CNA) (Dike's Depo 102:12-18, Exhibit B). However, Dike was initially assigned to the bariatric unit (Dike's Depo 103:3-4, Exhibit B).

9.    Dike's job duties included taking vital signs of patients, monitoring patients closely, cleaning patients, providing water for patients, and cleaning their bed. (Dike's Depo 103:19-23, Exhibit B), and he was supervised by RNs (Dike's Depo 103:24-25; 104:1-2, Exhibit B).

10.    For the year 2016, Zamora held the position of 3 West Nurse Manager at the Medical Center (Zamora Depo 6:6-8, Exhibit G) until July 17, 2017 (Zamora Depo 6:14-18, Exhibit G). Part of Zamora's duties included managing all employees with their schedule and meeting the needs of the patients (Zamora Depo 6:19-25). Zamora's immediate supervisor was Jason Sewell (Zamora Depo 7:1-3, Exhibit G).

11.    Zamora first met Dike when he came in for an interview for a 3 West CNA and she personally interviewed him (Zamora Depo 7:14-18, Exhibit G), and she

determined that he would be a good hire (Zamora Depo 8:l, Exhibit G) as a certified nurse assistant ("CAN") (Zamora Depo 7:5-7, Exhibit G).

12.     Sewell, who was Zamora's supervisor, was the assistant chief nursing officer for the Corpus Christi Medical Center (Sewell Depo 5:23-25, Exhibit F) in 2018 or 2019 (Sewell Depo 6:7-10, Exhibit F) and Kathleen Rubano is Sewell's first line supervisor (Sewell Depo 7:5-9, Exhibit F). When Dike was first hired by the Medical Center, he was assigned to the bariatrics unit (Sewell Depo 10: 3-5, Exhibit F) as a CNA (Sewell Depo 10:23-25, Exhibit F) and Dike's immediate supervisor was Chris Goodwine in 2017-2018 (Sewell Depoll:16-25; 12:1-3, ExhibitF).

13.     Kathleen Rubano is the Chief Nursing Official for Corpus Christi Medical Center (Rubano Depo 9:19-23, Exhibit E) where she is responsible for the overall nursing care of the patients within the healthcare system, as part of a multi-hospital system. (Rubano Depa 10:1-4, Exhibit E).

14.     The decision to terminate Dike was made by the Chief Nursing Officer, Kathy Rubano, based on the recommendation of Goodwine and the hospital CEO (Goodwine Depo 69:2-13, Exhibit D) Jay Woodall (Goodwine Depa 70:18-20, Exhibit D).

15.     On or about June 27, 2016, Dike, Lawrence Dike, was hired by the Corpus Christi Medical Center (hereinafter Medical Center, CCMC, or Defendant) to work as a Certified Nurse Assistant (CNA) and paid $13.52 an hour, along with benefits,

including medical and dental coverage. When hired by the Medical Center, Dike was assigned to work in two units: 3 West and Bariatric. The Bariatric unit was Dike's main unit where Ms. Christine Goodwine was the nurse manager for the Medical Center. Ms. Marissa E. Zamora was the nurse manager for the 3 West unit. Both Ms. Goodwine and Ms. Zamora reported to Mr. Jason Sewell, Director of Nursing, who reported to Ms. Kathleen Rubano, Chief Nursing Director for HCA Healthcare, Inc.

16.     Operationally, Dike's job required him to take care of patients under the guidance and direction of charge nurses like Ailyn Alcoba, Brenda Brenyan, Monica Rivera, Ana Hall, Angela Guerra, Ryan Guerra and others. Dike's charge nurse in the Bariatric unit was Ryan Guerra.

17.     As a Certified Nurse Assistant for the Medical Center, Dike's duties and responsibilities were to work closely and directly with medical patients in a number of different circumstances under the guidance and direction from medical staff responsible for the care of patients within the medical facility. Generally, Dike was responsible for working with and helping patients with various activities, monitoring the vital signs of patients, and reporting the condition of patients, including their physical and emotional conditions, to name a few.

18.     While employed at the Medical Center, Dike satisfactorily performed his duties as a Certified Nurse Assistant and met the performance standards established by the Medical Center.  Pursuant to the Collective Bargaining Agreement in effect,

Dike's initial 90-day probationary period ended on September 26, 2016. Dike completed his initial orientation at Doctor's Regional Campus which is also part of the network of hospitals owned and operated by Defendants. For Dike's Initial 90 Day Appraisal, on October 7, 2016, Mike Conwill, Director, Human Resources for the Medical Center noted that Dike satisfactorily completed the "initial competencies" and demonstrated satisfactory performance of duties per job description during 90-day evaluation period. Mr. Conwill commented in Dike's Initial 90 Day Appraisal that Dike was an "Exceptional CNA Asset to the Unit".

19.     The following year, on or about July 5, 2017, Dike was evaluated by one of his supervisors, Ms. Zamora, who documented Dike's annual evaluation wherein it noted "Satisfactory Completion of Employment Year", where his Summary of Strengths noted, "Team player, helpful, customer-service oriented and dependable", to name a few. This was backed up by numerous "Kudos 2 U" . . . "for making a difference in our patients' lives" issued by Ms. Zamora.  Moreover, for Dike's first-year anniversary, Ms. Zamora wrote a personal note to Dike that provided, "Just want to say thank-you for all your hard work & to let you know I do appreciate you".

27.     Despite Dike's satisfactory work performance and positive contributions to the Medical Center's workplace objectives, for reasons motivated by racial animus, Dike was subjected to concerted efforts by several employees at the Medical Center to undermine and subvert Dike's employment status at the Medical Center. Even

worse, over an extended period of time, on account of his race, color and national origin, Dike was subjected to repeated unsubstantiated claims of employee misconduct, which created a hostile work environment. Moreover, when Dike objected to the disparate discriminatory treatment, he suffered retaliation until March 30, 2018, when Dike was wrongfully terminated.

28.     The discrimination toward Dike took on many forms. In or around August 2016, the Medical Center staff routinely and regularly changed Dike's work assignments on the premise that certain patients did not want Dike involved in their medical care because he is black. To make matters worse, Dike was constantly ridiculed by the Medical Center's charge nurses and some of its Filipino nurses that African food stinks.

29.     On a regular basis, Dike was informed by the charge nurse, Monica Rivera, that she prefers Filipino employees to black employees. These comments and actions were reported by Dike to his supervisor, Ms. Zamora, on or about November 2016. However, instead of denouncing or rejecting the preference or practice expressed by Ms. Rivera, Ms. Zamora dismissed Dike's report and complaint and failed to investigate Dike's complaint or take appropriate effective action. Ms. Zamora's attitude was that Dike's complaint was nothing more than a joke and by her silence, Ms. Zamora adopted Ms. Rivera's discriminatory practice and attitude.  So to argue

that Appellees took immediate remedial action is disputed and is a question of fact for the jury.

30.    The following month, on or around December 2016, Dike reported to Ms. Zamora that a co-worker, Kevin Hernandez told Dike to keep a 12-feet distance from him on account of Dike's African culture and national origin. Mr. Hernandez made it clear to Dike that he "cannot flow" with Dike the way he flows with Marvin who has the same culture and national origin as him (Mr. Hernandez). Another opportunity to articulate clearly the Medical Center's practice and policy on its standards involving non-discrimination, tolerance and respect for employee racial and ethnic characteristics was ignored.

31.    Ms. Zamora's response to Dike's complaints about Mr. Hernandez's comment was to tell Dike to ignore Mr. Hernandez and "Kill him with kindness". When Dike explained to Ms. Zamora how her response would be difficult as a practical matter and would compromise patient safety, Ms. Zamora insisted that Dike ignore Mr. Hernandez. Even so, the Medical Center failed to take or implement appropriate action against Mr. Hernandez, or unequivocally emphasize to him and Medical Center employees that Mr. Hernandez's comment and behavior is antithetical to its policy and core beliefs.

32.    In response to Dike's discrimination complaints, on or about January 2017, Ms. Zamora wrote up Dike for clocking out after 7:30 a.m. However, this was

another instance where Dike was singled out to work with a restrictive time frame not applied to other non-black CNAs. Other non-black CNAs were allowed to work the same time periods and clock out as Dike, but they were not disciplined.

33.    As part of the evolving scheme to discriminate against Dike on account of his race, color, and national origin, unlike other non-black CNAs, the Medical Center management made false claims against Dike that he was rude, unprofessional, and disrespectful toward co-workers and staff. Dike denied these unfounded assertions and allegations and asked Ms. Zamora for supporting documentation or proof but Ms. Zamora did not provide Dike with any credible documentation of her allegations. Moreover, Dike asked Ms. Zamora to review or examine video recordings available to the Medical Center but Ms. Zamora declined the request from Dike. Consequently, the behavior and conduct permitted by the Medical Center made working conditions for Dike difficult and stressful, which grew worse over time.

34.    The discrimination and hostile work environment Dike was forced to work in was tolerated by the Medical Center. For example, on or about February 6, 2017, Dike reported to Ms. Zamora that a patient told Dike that she did not "want a black Nigger to take care of her". Ms. Zamora was informed this information was reported to the patient's nurse who responded to Dike to "get over it" and the nurse switched Dike's patient assignment. Even worse, Ms. Zamora told Dike "there is nothing

wrong with what the patient said". Ms. Zamora then explained to Dike that "if a patient doesn't want a black person" then the response is "to give that patient somebody who is not black".

35.    In support of the Medical Center's policy or practice, Ms. Zamora instructed the charge nurse not to assign any black employee to that patient because that patient does not want black employees.

36.    On or about June 20, 2017, this same sentiment was expressed and affirmed by Mr. Sewell and the Medical Center's Director of Human Resources, Vince Goodwine, when Mr. Sewell told Dike "If the patient said that I don't want to have someone black take care of me, and we have someone who is not black then we make it happen for the patient." As expressed by Mr. Sewell, this was established, tolerated, and accepted policy and practice for Medical Center nurses, charge nurses, house supervisors and nurse managers.

37.    The Medical Center's efforts to impose its discriminatory scheme against Dike was perpetuated by its false and unsubstantiated claims that Dike left his unit without permission.  Before leaving his unit, Dike consistently and regularly got permission from and notified his nurse. Another false narrative postulated by the Medical Center claimed that Dike was sleeping on the job, which he denied. In reality, Dike had reported to a charge nurse or the supervisor that non-black employees were sleeping on the job. What's more, Ms. Zamora and Mr. Sewell,

refused to review stored video and records to verify Dike's claims or take action against non-black employees for sleeping on the job.

38.    Mr. Sewell and other Medical Center management officials consistently pressured Dike to transfer to another unit as their solution to address the racial discrimination problem that was endemic in the unit. Dike rejected this option inasmuch as it was not favorable to him.

39.    In response, on or about August 11, 2017, Mr. Sewell informed Dike about an alleged incident that Dike had thrown papers at Kat Ibarra at the nurse's station. Dike unequivocally denied this claim and Dike implored Mr. Sewell to look at the Medical Center video recording records to back up or substantiate Dike's denial. However, without an explanation, Mr. Sewell informed Dike that he would accept Ms. Ibarra's word and not look at the video recording.

40.    Having committed to a course of action to undermine Dike's employment with the Medical Center, Mr. Sewell devised and orchestrated a plan to monitor Dike's work duties to see if he could find Dike sleeping while at work. To implement this scheme, on or about June 15, 2017, Mr. Sewell instructed Mr. Kevin Hernandez to follow Dike throughout his work shift to see if he could catch Dike sleeping. This tactic was not used or applied to nonblack Medical Center employees under Mr. Sewell's supervision. Dike learned about Mr. Hernandez's project after Mr. Hernandez informed Dike that Mr. Sewell had asked him to spy

on Dike and other black employees.

41.    For a considerable period of time, Mr. Sewell contemplated and took steps to destabilize and subvert Dike's employment at the Medical Center. To do so, on or about July 16, 2017, a CNA and nurse, under the instruction of Mr. Sewell, falsely reported that they saw Dike physically assaulting or hitting a patient. And Mr. Sewell threatened to get Dike arrested. With this serious charge, an investigation was conducted that revealed and uncovered that the allegation was not true. The patient and his wife told the Medical Center management that the patient had made no such complaint against Dike.

42.    During this same time period, Dike and Ms. Brenyah contacted John MacDonald, HCA Chief Operating Officer Northwest on or about July 13, 2017, about, among other things, racial harassment and discrimination.

43.    Afterwards on or about August 5, 2017, Mr. MacDonald responded to their e-mail stating he would contact HR and find out about this investigation.

44.    Two days later, Mr. MacDonald contacted Stephanie Ties HCA Ethics Complaint and Thomas Cook, HCA Case Manager. They both promised to Dike and Ms. Brenyah that they had the power to stop the hostile work environment and discrimination. However, on or about October 2, 2017, Ms. Ties contacted Dike and told him she could not help Dike.

39.    Mr. Sewell, on or about September 22, 2017, issued a final warning to Dike

after he had notified Mr. Sewell about a complaint about a switched patient assignment by the charge nurse who claimed the patient did not want Dike because he is black.

40.    Also, Dike opposed and reported discriminatory conduct that occurred to another Black African Ghanaian employee, Ms. Brenyah. Dike reported to upper management and Human Resources that the charge nurses were using Dike's race, by using patient's requests to not have Dike assigned to them because of his race, to justify changing his assignments to benefit non-Black and non-Black African employees. This was reported to Ms. Zamora, but she just made excuses and allowed Dike to be subjected to discrimination by patients without taking any appropriate action. This position was also condoned by Mr. Sewell. Instead of the employer investigating the reports of race discrimination and retaliation raised by Dike, it condoned and effected the racially discriminatory and retaliatory write-up of Dike and race discrimination within the hospital. What's more, Dike and Ms. Brenyah elevated their complaints to HCA Healthcare, Inc. in Nashville, TN by contacting John MacDonald COON HCA on July 31, 2017.

41.    Moreover, although Dike shared his frustrations and opposition to discriminatory employment practices to Ms. Rubano, despite her representation to Dike, she never responded to or followed up to meet with Dike about his report.

42.    After a prolonged period of discriminatory treatment, on or about December 22, 2017, Dike filed a discrimination complaint through the Equal Employment Opportunity Commission (EEOC) against the Appellees Notwithstanding notice from the EEOC about Dike's December 22, 2017, discrimination charge, the Medical Center and HCA continued their discriminatory treatment of Dike when he was not given the customary coverage for his breaks.

43.    Several months later, despite Dike's invocation of HCA's internal complaint procedure, which involved Thomas Cook, HCA Case Manager and Kathleen Rubano, Chief Nursing Officer at HCA and others, on or about March 15, 2018, Dike contacted Ms. Rubano about discriminatory treatment and retaliation. But Ms. Rubano did nothing to resolve these concerns and complaints.

44.    Instead, on or about March 18, 2018, at a meeting, Dike was asked about his whereabouts at work on February 28, 2018. Although Dike asked for information from the Medical Center and HCA about the inquiry, the Appellees' management refused to provide Dike with the requested information. During the meeting, Mr. Sewell was asked to explain why other non-black employees were held to a different standard. However, Mr. Sewell refused to respond, and he refused to allow Dike an opportunity to review the alleged video recording of Dike's whereabouts on February 28, 2018.

45.    Within two weeks, without giving Dike a chance to review and comment on

the February 28, 2018, video recording held by the Medical Center, in retaliation for

Dike's earlier complaints of discrimination, Mr. Vine Goodwine, Vice President of

HR HCA called Dike and terminated him on March 30, 2018.

## SUMMARY OF ARGUMENT

There is conflicting testimony and conflicting evidence and facts which, as the trial court points out, are undisputed. There are key issues bearing on Dike's retaliation and discrimination claims which should have been determined by a jury.

A reasonable jury could reject Appellees' account of the events, and instead interpret the evidence presented by Appellant Dike as evidence of retaliation and discrimination. All of the statutes involved in this case have anti-retaliation provisions and the evidence set out presents evidence of retaliation, and discrimination. Moreover, the asserted reasons and positions by the various company representatives themselves contradict each other. "[R]esolving conflicts in testimony is the exclusive providence of the trier of fact and may not be decided at the summary judgment stage." *Ramirez v. Landry's Seafood Inn & Oyster Bar*, 280 F.3d 576, 578 n. 3 (5th Cir. 2002).

A reasonable jury could reject as pretextual the justifications proffered by Appellees for dismissing Dike. A jury can infer pretext from the fact that a "Defendant's explanations and reasoning have transformed over time." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242-43 (5th Cir. 2017).

## ARGUMENT

### A.    Standard of Review.

This Court reviews de novo a grant of summary judgment, applying the same standards as the district court. *Caldwell vs. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017). The burden is on the moving party to establish that there is "no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Sims v. City of Madisonville*, 894 F.3d 632, 637 (5th Cir. 2018) (quoting *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013)); see *Redburn v. City of Victoria*,898 F.3d. 486 (5th Cir. 2018) ; *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 877 F.3d 177, 189 (5th Cir. 2018); *Patton v. Jacobs Engineering Group, Inc.*, 874 F.3d 437, 442 (5th Cir. 2017). "[A]ll that is required [to defeat a motion for summary judgment] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).

Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The United States Supreme Court reminded us that courts cannot resolve genuine disputes of fact in favor of the moving party, especially where there are

competing affidavits. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (May 5, 2014); *See also*

*Brosseau v. Haugen*, 543 U.S. 194, 195, n. 2, 125 S.Ct. 596, 160 L.Ed.2d

583(2004)(per curiam).

In ruling on a motion for summary judgment, a judge's role is to determine

whether there is a genuine issue for trial, not to weigh the evidence and determine

the truth of the matter. *Tolan v. Cotton* at 1866.

**B.    A reasonable jury could find that Lawrence Dike was subjected to discrimination, harassment and then retaliation because he complained about discrimination and retaliation based on his race, color and national origin.  The evidence is clear that the District Court disregarded the applicable summary judgment standards and that the standards applied by the court do not consider or improperly disregard the recent opinions in Muldrow, Hamilton and Abdallah.**

The District Court in this case issued its Memorandum Opinion and Order on

January 2, 2024.  However, the landscape of Title VII cases and required showings

and damages was significantly impacted by the recent United States Supreme Court

opinion in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. ---- (April 17, 2024).

Much like in the *Muldrow* case, this court should vacate and/or set aside the opinion

of the District Court and remand to the District Court for reconsideration, including

re-briefing and/or reconsideration, based on the *Muldrow* opinion and/or this court's

recent opinions in *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir., August 18,2023)

and *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006 (5th Cir., October 13, 2023).

Indeed, remanding is justified in the interest of justice and to ensure that the proper

standards were/are applied in light of the new jurisprudence. *Muldrow*, *Hamilton* and *Abdallah* were issued after the final MSJ briefs were filed in the case. Appellees filed their motions for summary judgment on August 15, 2023 (Dkt 38 with exhibits at 39, 40, 41and 42. Appellant filed his response on August 5, 2023, prior to the opinions were issued in *Hamilton*, *Abdallah* and *Muldrow* (Dkt 43 and 44). Reply briefs were filed by Appellees on September 12, 2023 (Dkt 46 and 47).

Muldrow addressed Title VII and held that an employee challenging harm or discrimination under Title VII must show that the action brought about some harm with respect to an identifiable term or condition of employment, but that harm need not be significant. To require that the conduct be "severe or pervasive" as the District Court found cannot stand under the *Muldrow, Hamilton and Abdallah* opinions.

Moreover, in *Hamilton*, the Fifth Circuit held that a Dike plausibly alleges a disparate-treatment claim under Title VII if she pleads discrimination in hiring, firing, compensation, or the "terms, conditions, or privileges" of her employment. A Dike need not also show an "ultimate employment decision," a phrase that appears nowhere in the statute and that thwarts legitimate claims of workplace bias. The District Court in this case improperly required a heightened standard of harm in order to establish a claim under Title VII and/or 1981, which, as the Fifth Circuit pointed out, is not necessary under the statute.

Finally, the Fifth Circuit in *Abdallah* held that in establishing a 1981 claim, as asserted by Appellant in the present case, the test is whether the outcome would be different but for the protected class that can be shown by comparing the experience of the Dike to what his treatment would have been but for the protected class or by comparing the experience of the Dike to another individual without the protected class. If either leads to a different outcome, disparate treatment has occurred. *Id.* at 1015.  It cannot be disputed that in the present case the facts demonstrate that Appellant was treated differently both by patients and staff because of his race, color or national origin.  Moreover, despite his allegations and complaints, it was inevitably Appellant that was disciplined as opposed to the Defendants taking appropriate action to stop any disparate treatment or discrimination.  While Appellees contend they took immediate action to resolve the discrimination issues, in most instances they simply found no evidence of discrimination and took no action as a result or simply took no action at all.

In its Memorandum Opinion in this case (Dkt 50), the District Court addressed each of the Appellant's claims regarding his discrimination, harassment and hostile environment claims that fall under the scope of his discrimination claims finding that the harassment about which Dike complained was either unsubstantiated, not related to his race/color/national origin, or "otherwise not sufficiently severe and pervasive" to support a hostile work environment claim.  For example, the court

found that Dike had emailed Sewell on May 19, 2017, to complain about hostile and discriminating treatment.

As the District Court points out, Dike had complained about hostile and discriminating treatment, including a request by fellow CNA Kevin Hernandez to keep 12 feet of space between them due to Dike's culture differences and color orientation, alternative and clear code words for race, color and national origin discrimination. In response, Sewell met with Hernandez, who admitted that he did request 12 feet of space. Nevertheless, no action was taken to alleviate the discriminatory treatment.

Dike also alleged that on two occasions, June 2017 and September 2017, his patient assignments were changed because of his race. His Second Amended Complaint and deposition testimony included numerous other allegations related to this claim.

Dike provided ample evidence of discrimination and a hostile environment based on his race, color and national origin. Dike testified that, beginning in August 2016, three charge nurses (Anna Hall, Monica Rivera, and Angela Guerra) harassed him by having his patient assignment changed every time he worked with them, approximately twice per week, because patients did not want a Black person caring for them. Dike Dep. at 112, 121, 123. Dike said that he reported to Zamora each time his patient assignment was changed, and she responded to "kill them with a smile"

and that "we make it happen for the patient." Id. at 123, 124. Dike testified that on two occasions in February 2017, a patient told him they did not want a "nigger" taking care of them. Id. at 114. Dike stated that he reported the comments to Zamora, who, instead of addressing the discrimination, spoke with the patient and then wrote Dike up for being rude to the patient; demonstrative of clear retaliation. Id. at 116, 117, 120.

Following Zamora's investigation, Dike's charge nurse removed the patient from Dike's care. Id. At 117. According to Dike, a second female patient told him she didn't want "the male freaking nigger" to take care of her, in March 2017. Id. at 118. The court indicates it is unclear whether his patient assignment was changed; by the time Dike reported the comment to Zamora, the patient had already been discharged. Id. at 120, 121.  Nevertheless, there is no evidence that remedial action was taken in any way by Appellees.

The documentary evidence shows that Dike received a written warning on February 6, 2017, after a patient complained that he yelled in a rude and disrespectful manner and she demanded he leave the room and not return. Under Employee Comments, Dike wrote, "The patient statement against me is not valid is false. She was very rude to me and I reported it to Emy the nurse as I humbly disagree with her." D.E. 39-17. In his May 19, 2017 email to Sewell, Dike reported that he was written up after he was kicked out of a female patient's room who wanted to be

cleaned by a female nurse. In altering the summary judgment standard of review and construing the facts in favor of the Movant, as opposed to construing them in favor of the Non-Movant, the District Court found that neither the written warning nor Dike's email complained that the patient used the N-word or that Dike was reassigned because the patient wanted a caregiver of a different race. Dike also did not mention the three charge nurses who allegedly changed his patient assignment twice per week based on his race.  However, Dike did complain about the three charge nurses and their conduct.  It was not necessary to annotate the allegations in his written warning.

In his June 19, 2017, email to Sewell, Dike complained that, nine days earlier, Hernandez had asked to switch patient assignments because Dike's patient said she did not want a Black caregiver. Dike believed that Hernandez either made up the story to hurt him or had "incited" the patient about Dike's color, since Dike had cared for the same patient earlier in the day without issue.

In his September 9, 2017, email to Sewell, Dike complained, [T]his is not the first time charge nurses have switched my patient assignment because I reported patient safety issues or my skin color (with the excuse that a patient said she does not want me because I'm black).

The summary judgment evidence shows that, at least once, Dike complained to CCMC that he was reassigned because a patient did not want him to treat them

because he is Black. Goodwine purportedly conducted employee interviews regarding this incident and Dike's other complaints of racial discrimination; However, Sewell was purportedly unable to personally address this issue with the patient, who had already been discharged by the time Dike complained. Sewell Dep. at 31,32.

The District Court impliedly construes the evidence in Appellees' favor even though CCMC did not have a policy regarding how to handle race-based patient requests, but instead allowed the charge nurse to handle any requests on a case-by-case basis. Id. at 28; Zamora Dep. at 23, 24. Sewell testified that CCMC did not want to put its employees in a situation where they're going to be, you know, caring for somebody who [has] kind of bias like that.  So if we can accommodate the assignment and give them a better work environment, then we would want that. Sewell Dep. at 27. CCMC also wanted to make sure the patients have a voice because "[t]hey have the right to . . . refuse medical treatment, participate in treatment. Id. at 29. Goodwine testified similarly that CCMC tries to have the best interests of both parties at stake here and will accommodate patients' requests if possible in order to avoid placing an employee in a hostile environment based on race.  Goodwine Dep. at 122.

The District Court recognized that "Courts outside the Fifth Circuit have held that a healthcare provider's policy or practice of assigning or excluding caretakers

based on patients' racial preferences may create a hostile work environment and/or constitute employment discrimination. *See Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908 (7th Cir. 2010) (work environment at nursing home, which included a written policy of not allowing black nursing assistant to provide care for or even enter the room of resident who did not want care from Black assistants, was hostile or abusive); *Dysart v. Palms of Pasadena Hosp.*, 89 F. Supp. 3d 1311 (M.D. Fla. 2015) (stressing that hospital's policy that Patient X, who had been mugged by a Black male, should not be treated by any Black or dark-skinned people amounted to a "no Blacks allowed" sign posted on the patient's door and was approved all the way up the chain of command, including by the CEO); *Blackburn v State*, 375 P.3d 1076 (Wash. 2016) (state hospital's staffing directive that explicitly prevented Black employees from working on particular ward over course of one weekend due to their race constituted disparate treatment but did not rise to the level of severe or pervasive harassment to support a hostile work environment claim).

The District Court recognized that, unlike these cases, CCMC did not have a policy or assignment system based around patients' racial preferences. However, the District Court disregards the practice of allowing the charge nurses to handle the issues on a case by case basis at their sole discretion and without policy guidance. The District Court improperly disregarded Dike's own testimony, showing that his charge nurses routinely changed his patient assignments based on his race. The

District Court further improperly disregards Dike's claim that Zamora dismissed his complaints about being reassigned or wrote him up after he complained that a patient used a racial slur towards him; all evidence demonstrating a question of fact.

The District Court improperly found that Dike's complaint as to race-based patient assignments does not raise a fact issue as to hostile work environment or any other employment discrimination claim. The court cites to *Crane v. Mary Free Bed Rehab. Hosp.*, 2015 WL 10791897, at *6 (W.D. Mich. Mar. 13, 2015), aff'd, 634 F. App'x 518 (6th Cir. 2015), (recognizing that an employer's race-based assignment of duties may constitute adverse employment action even without a change in pay, benefits, prestige, or responsibilities, but finding there was no adverse employment action because impact on employee was temporary and de minimus), also citing to *Deasfernandez v. Beaumont Health Sys.*, 154 F. Supp. 3d 534, 539 (E.D. Mich. 2015) (hospital's practice of recording patients' racial preferences on intake forms, which were kept in the administrative office and not distributed to the nurses daily, did not create a hostile work environment). However, in light of the opinions in *Muldrow*, *Hamilton* and *Abdallah*, this matter should be remanded to consider these very arguments under the revised standards.

As the District Court points out, "it is undisputed that Dike complained about treatment by RN Ailyn Alcober on numerous occasions" regarding discriminatory treatment. Nevertheless, the court disregards the evidence in improperly granting

summary judgment.  As the court points out, Dike's May 19, 2017, email to Sewell complained that Alcober "disrespected me in a patient room as well as running me down with foreign language," and after he complained to Zamora, "Ailyn got other Philippine nurses on 3west against me." In response to Dike's May 28, 2017, email complaining that Alcober had yelled at him and told him to shut up, Zamora met with Alcober and reiterated the CCMC standards of behavior to treat employees with courtesy and respect. After Dike complained to Zamora about Alcober again being rude to him, Zamora called Alcober and Guerra into her office with Dike to resolve the conflict. On June 19, 2017, Dike again complained to Sewell and Goodwine about Alcober, stating that "humiliating, disrespecting and harassing me before the patients is the norm for her." Sewell and Goodwine met with Dike the following day to discuss their investigation into his complaints about Alcober, among other things. The District Court finds Dike has failed to rebut Defendants' summary judgment evidence that CCMC took prompt remedial action in response to his complaints regarding Alcober.   However, the record is replete with demonstrations that Defendants would take no action, find that there was no conclusive evidence and/or take actions whether or not the actions satisfied Dike's concerns.

Dike's May 19, 2017, email to Sewell stated that, after he complained to Zamora about the mistreatment by Alcober described above, Alcober "got other Philippine nurses on 3west "against me", so they keep frustrating me by speaking

their foreign language and finding faults on me each time we are working." In June 2017, to address Dike's complaint about employees speaking in a foreign language in his presence, Zamora instructed unit employees that while it was "perfectly okay to speak your language with your co-workers" in private settings, they should avoid doing so when others were around in order to avoid making others uncomfortable. Acknowledgement of Language Policy, D.E. 40-5.

Dike's EEOC Charge and Second Amended Complaint alleged that charge nurses Monica Rivera and Angela Guerra repeatedly told him that his African food stinks and would leave the break room and close the door while he was eating. Dike testified during his deposition that Rivera said that a Black nurse named David Mike was "no longer black" and had "upgraded his status" because he married a Filipino. Dike Dep. at 142☐44. Dike also testified that he heard Rivera say "at least five times" that "blacks play the race card" and that she preferred to eat Filipino food. Id. at 144☐45. Dike did not raise these allegations in his many written complaints of discrimination to CCMC management; however, another Black nurse, Brenda Brenyah, complained of such comments in May 2017. Sewell Decl. ¶

Dike testified that Brenda made a complaint about Rivera's comments and that he and Brenya "always talk about our case." Dike Dep. at 196, 264.  Goodwine and Sewell investigated Brenyah's complaints by interviewing the individuals involved. Sewell Decl. ¶ 4. Rivera stated that she had made comments about foods

(such as microwaved fish) stinking generally, but it was not specific to one type of food or race. Id. Mike stated that Rivera had once told him he was not Black anymore because he married a Filipino, but he was not offended and didn't feel the comment was inappropriate because □that was their relationship. Id. Sewell counseled Rivera and others to be mindful and that such comments should not be made. Id.

Rivera's comments that another employee had "upgraded his race" or that "blacks play the race card" constitute "second-hand harassment," which occurs when the Dike does not personally hear the remarks or when the remarks were not directed at the Dike. *See Johnson v. TCB Const. Co., Inc.*, 334 F. App'x 666, 670 (5th Cir. 2009) (second-hand harassment is less objectionable than harassment directed at the Dike). The Fifth Circuit has held that second-hand harassment is insufficient to constitute a hostile work environment. See Frazier v. Sabine River Auth. La., 509 F. App□x 370, 371□72, 374 (5th Cir. 2013). Dike has also failed to rebut Defendants' summary judgment evidence that CCMC took prompt, remedial action in response to both his and Brenyah's complaints.

Dike claimed in response to Defendants' motion for summary judgment that his coworkers harassed him by mocking his accent. Citing only his own deposition testimony, Dike claimed that his charge nurses would mimic everything he said each time he worked with them. Dike Dep. at 145, 147. Dike said he complained to Zamora once, but the mocking continued. Id. at 157, 158. The District Court asserts

Dike did not raise this issue in his EEOC Charge or Amendments, his Second Amended Complaint, or in his various emails to CCMC management. The District Court again disregarded the applicable standards.

The evidence is clear that the District Court disregarded the applicable summary judgment standards and that the standards apply do not consider or improperly disregard the recent opinions in Muldrow, Hamilton and Abdallah. this court should vacate and/or set aside the opinion of the District Court and remand to the District Court for reconsideration, including re-briefing and/or reconsideration, based on the Muldrow opinion and/or this court's recent opinions in Hamilton v. Dallas County, 79 F.4th 494 (5th Cir., August 18,2023) and Abdallah v. Mesa Air Grp., Inc., 83 F.4th 1006 (5th Cir., October 13, 2023).

**C.     A Reasonable Jury Could Find That Appellees Fired Dike In Retaliation For His Complaints About Discrimination, And Retaliation Based on the Numerous Substantial Conflicts In Evidence, A Reasonable Jury Could Conclude That There Is Compelling Evidence Of Discrimination and Retaliation.**

This appeal can be decided based on the well-established rule that conflicts in evidence or testimony cannot be resolved at summary judgment. Even though the trial judge initially states in his order granting the summary judgment that the "basic facts of the case are undisputed," supporting the factual summary presented by the Appellant in the trial court.  However, the judge improperly invaded the province of the Jury and made her own conclusions based on the evidence. "[A] 'judge's function'

at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotations and citation omitted). "[I]t is the function of the jury as the traditional finder of the facts, and not for the Court, to weigh conflicting evidence and inferences and determine the credibility of witnesses." *EEOC v. Boh Bros. Constr. Co., LLC,* 731 F.3d 444, 452 (5th Cir. 2014) (en banc) (internal quotations and citations omitted). "[R]esolving conflicts in testimony is the exclusive province of the trier of fact and may not be decided at the summary judgment stage." *Ramirez v. Landry's Seafood Inn & Oyster Bar*, 280 F.3d 576, 578 n. 3 (5th Cir. 2002).

D.    **Based on the "Chain of Circumstances," A Reasonable Jury Could Conclude that There Is Compelling Evidence Of Retaliation**.

The Fifth Circuit analyzes the discrimination and retaliation claims under the *McDonnell Douglas* framework, as there is "no significant difference between such claims under the …. anti-discrimination laws." *Hunt v. Rapides Healthcare System*, 277 F.3d 757, 768 (5th Cir. 2001) (citing *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999)). More importantly, to determine the causal relationship between the employee's termination and his exercise of his rights, the Court may consider the "temporal proximity" between the two events. *Mauder*, 446 F.3d at 583. A retaliatory motive may be inferred if the termination occurs shortly after the exercise of his rights. Nero, 167 F.3d at 928, as occurred in this case.

The burden then shifts to the employer to state a legitimate, nondiscriminatory reason for the termination, which rebuts the presumption of retaliation raised by the *prima facie* case. *Id*. at 319320. If the defendant is able to do so, the burden then shifts back to the Dike to prove that the reason stated by the employer was a pretext, and that the actual reason for the termination was the exercise of his rights. *Id*. at 320. At the summary judgment stage, a Dike need only raise a genuine issue of material fact with regard to the *prima facie* showing. *Amburgey v. Corhart Refractories Corp*., 936 F.2d 805, 811 (5th Cir. 1991).

**E.     A Reasonable Jury Could Find All Reasons Given for Dismissing Dike Were Pretextual**.

"Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). The inaccuracy of a defendant's explanation can be highly probative because, if a disputed employment action were taken for a legitimate reason, the employer would know what that reason is. *Id.*, 530 U.S. at 147-48, citing *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978). "In the context of a summary judgment proceeding, the question is not whether the Dike proves pretext, but rather whether the Dike raises a genuine issue of fact regarding pretext." *Thornbrough v. Columbus & Greensville R. Co.*, 760 F.3d 633, 646 (5th Cir. 1985). There are genuine issues of fact on the reasons Appellees advanced in this case and/or the

reasons are pretextual based on contradiction of positions by management, falsity and temporal proximity alone.

Dike has offered sufficient evidence that Appellees' articulated reasons are a pretext for discrimination, or that Appellees' stated reasons, while true, are only some reasons for its conduct, and discrimination is another motivating factor. See *Autry v. Fort Bend Ind. Sch. Dist.*, 704 F.3d 344, 347 (5th Cir. 2013).

In establishing pretext, Dike has substantiated his claims through evidence demonstrating that discrimination lay at the heart of the decision to terminate him. *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The evidence is of such quality and weight that reasonable and fair-minded men or women in the exercise of impartial judgment might reach different conclusions." *Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir, 2003) (citation and quotation marks omitted). This is a case that should go to the jury.

A Dike may prove discrimination through either direct or circumstantial evidence. *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). "If the Dike presents only circumstantial evidence, then she must prove discrimination inferentially using the three-step McDonnell Douglas" burden-shifting framework. *Etienne v. Spanish Lake Truck & Casino Plaza, LLC*, 778 F.3d 473, 475 (5th Cir. 2015) (citation and quotation omitted). But if the Dike proffers direct evidence of discrimination, there is no need to resort to McDonnell Douglas

because, by definition, direct evidence "proves the fact of intentional discrimination without inference or presumption." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328–29 (5th Cir. 1994) (citation and quotation omitted).

34.    Direct evidence discrimination cases are "rare." *Equal Emp. Opportunity Comm'n v. Ryan's Pointe Houston, LLC*, No. 19-20656, 2022 WL 4494148 at *3 (5th Cir. Sept. 27, 2022) (quoting *Rutherford v. Harris Cty.*, 197 F.3d 173, 180 n.4 (5th Cir. 1999)). That is because it will be the rare case where "statements or documents" will "show on their face that an improper criterion served as a basis— not necessarily the sole basis, but a basis—for the adverse employment action." *Eaglin v. Tex. Children's Hosp.*, 801 F. App'x 250, 255 (5th Cir. 2020) (quotation omitted) (emphasis added) (quoting *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 993 (5th Cir. 2005)).

35.    To determine whether comments in the workplace constitute direct evidence of discrimination, the Court looks to four factors: "whether the comments are (1) related to the Dike's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision." *Etienne*, 778 F.3d at 476; accord *Wallace*, 271 F.3d at 222. "Comments that do not meet these [four] criteria are considered 'stray remarks,' and standing alone, are insufficient to  defeat summary judgment." *Jackson v. Cal-W. Packaging Corp.*, 602

F.3d 374, 380 (5th Cir. 2010). A court's "ultimate focus" in applying this direct evidence test "is on whether the comments prove without inference or presumption that [the protected characteristic] was a basis in employment decisions' at [the Dike's workplace]." *Herster v. Bd. of Sup. of La. State Univ.*, 887 F.3d 177, 187 (5th Cir. 2018) (quotation and citation omitted).

## F.    Temporal Proximity Supports A Finding of Discrimination and Retaliation

In addition to Pretext Evidence, temporal proximity also supports Dike's Discrimination and Retaliation Claims. It is undisputed that Appellant made numerous complaints centering on discrimination, harassment and retaliation. "Close timing between an employee's protected activity and an adverse action against [the employee] may provide the causal connection required to make out a prima facie case of retaliation." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (citation and quotation marks omitted). A Dike can satisfy his prima facie burden solely on the basis of timing by showing an interval between the protected activity and the adverse action. *Id.*

The Fifth Circuit in *Starnes v. Wallace*, No. 15-41341 (5th Cir. 2017) found a causal link when there was more than a year between the protected activity and termination.  The Fifth Circuit pointed out that the *Raggs* ruling is consistent with the closeness required when proximity between the protected activity and adverse

action alone is being used to establish causation. See, e.g., *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002) (holding that temporal proximity alone furnished insufficient evidence of causation to withstand motion for judgment as a matter of law when five months had elapsed). Sometimes, timing is all that can establish causation.

The Fifth Circuit wrote in Starnes:

But looking solely at temporal proximity in this case, when nearly identical evidence of pretext was found sufficient to allow Ludy to establish a fact issue on the ultimate question of causation, is the "rigid, mechanized, or ritualistic" application of McDonnell Douglas that the Supreme Court has warned against. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 5126 (2002)(quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)); see also *Gee v. Principi*, 289 F.3d 342, 346 n.3 (5th Cir. 2002) (explaining that temporal proximity is "part of [the] analysis, but not in itself conclusive" in establishing the causal link for retaliation (quoting *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir.1992)). Under that framework, the causation requirement for the prima face case is considered at the initial McDonell Douglas stage, with pretext evidence being evaluated at the separate final stage. But the big picture is that both the "causal link" of the prima facie case and the pretext inquiry are aimed at the ultimate question in a retaliation case: "whether the defendant discriminated against the Dike because the Dike

engaged in" protected conduct. *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996); see also *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (describing the ultimate inquiry as whether there is sufficient "evidence from which the jury may infer that retaliation was the real motive"). The difference is that the prima facie inquiry is the "much less stringent" causation standard. *Long*, 88 F.3d at 305 n.4. We thus recently recognized in the analogous burden-shifting framework of First Amendment retaliation claims that when Dikes had produced pretext evidence indicating that their employer's reason for terminating them was false, they had necessarily satisfied the causation element of the prima facie case. See *Bosque v. Starr Cnty., Tex.*, 630 F. App'x 300, 304–05 (5th Cir. 2015) (explaining that "attempting to cabin pretext evidence into the third prong is contrary to other precedent and commonsense").

Likewise here, the evidence that the district court found could allow a finding of pretext for Ludy Estrada—that only she and Starnes, the two individuals complaining about the FLSA violations, were permanently let go—also helps establish the "less stringent" causation element of the prima facie case. If a jury could disbelieve that Daybreak fired Ludy and Starnes for cost-cutting reasons, then that would be proof of a retaliatory motive. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)("In appropriate circumstances, the trier

of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

In this case, Appellant Dike made numerous complaints that were followed by discipline by the Appellees against Dike. All of the combined disciplinary actions served as a basis for Dike's ultimate termination.

## Conclusion and Prayer for Relief

For the foregoing reasons, Appellant prays that the Summary Judgment in this matter be reversed, in whole or in part, and the matter remanded to the trial court for a trial on the merits, in whole or in part, and/or rendered in favor of Appellant, in whole or in part, and for such other and further relief to which Appellant may be entitled at law or in equity. Alternatively, Appellant further requests this court should vacate and/or set aside the opinion of the District Court and remand to the District Court for reconsideration, including re-briefing and/or reconsideration, based on the *Muldrow* opinion and/or this court's recent opinions in *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir., August 18,2023) and *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006 (5th Cir., October 13, 2023), and in the interest of justice so that justice may prevail.

Respectfully submitted,

**/s/ Adam Poncio**
 **ADAM PONCIO**
 **State Bar No. 16109800**

**PONCIO LAW OFFICES**
**A Professional Corporation**
**5410 Fredericksburg Road #109**
**San Antonio, Texas 78229-3550**
**(210) 212-7979 Telephone**
**(210) 212-5880 Facsimile**

**ATTORNEY FOR APPELLANT**

## Certificate of Service

I certify that a true and correct copy of this document has been served upon counsel for the appellee via the court's electronic filing system on May 15, 2024.

*/s/ Adam Poncio*
**ADAM PONCIO**

## Certificate of Compliance

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This document complies with the word limit of Fed. R. App. P. 32(a)(7(b)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(g), this document contains 10,264 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionately spaced typeface using Microsoft Word 365 in 14 point Times New Roman.

*/s/ Adam Poncio*
**ADAM PONCIO**
**COUNSEL FOR APPELLANT**

Dated: May 15, 2024